CONSUMER ATTORNEYS PLC
James Ristvedt, AZ Bar #035938
8245 N. 85th Way
Scottsdale, AZ 85258
E: jristvedt@consumerattorneys.com
T: (480) 626-1956

CONSUMER ATTORNEYS PLC
David A. Chami
AZ No. 027585
dchami@consumerattorneys.com
8245 N. 85th Way
Scottsdale, Arizona 85258
Telephone: (480) 626-2359

*Attorneys for Plaintiff*
*Esteban Arciniega*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Esteban Arciniega,<br><br>            Plaintiff,<br><br>v.<br><br>Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union, LLC, BLST Receivables & Servicing, LLC d/b/a Fingerhut,<br><br>            Defendants. | Case No.: 2:23-cv-00245-SPL<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.'S MOTION TO COMPEL ARBITRATION** |

## I.   <u>INTRODUCTION</u>

The immediate litigation is brought before the Court under the Fair Credit Reporting Act ("FCRA"). Plaintiff Esteban Arciniega ("Plaintiff") was the victim of inaccurate consumer reporting at the hands of Defendant Experian Information Solutions, Inc. ("Experian"). Plaintiff alleges claims against Experian under 15 U.S.C. §§ 1681e(b) and

1681i. In the immediate motion, Experian argues the dispute between Plaintiff and Experian should be compelled to arbitration based on an allegedly applicable arbitration agreement (the "ECS Arbitration Agreement[1]"). As detailed herein, the ECS Arbitration Agreement is both substantively and procedurally unconscionable. Therefore, the Court should deny Experian's Motion to Compel Arbitration (the "Motion") and allow Plaintiff to continue to litigate his claims against Experian in this Court.

## II.    <u>LEGAL STANDARD</u>

In evaluating arbitration agreements, federal district courts must apply state-law contract principles. *See Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (cleaned up) ("To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts").

Under Arizona law "[a]n unconscionable contract is unenforceable." *Clark v. Renaissance W., LLC*, 307 P.3d 77, 79 (Ariz. Ct. App. 2013). "A contract may be procedurally unconscionable and/or substantively unconscionable." *Cooper v. QC Fin. Services*, 503 F. Supp. 2d 1266, 1278 (D. Ariz. 2007) (citing *Maxwell v. Fidelity Financial Services, Inc.*, 184 Ariz. 82, 89-90, 907 P.2d 51 (1995)).

"Procedural unconscionability is concerned with unfair surprise, fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should." *Jones v. Bank of Am., N.A.*, No. CV-09-2129-PHX-JAT, 2010 U.S.

---

[1] For ease of reading, throughout this opposition memorandum, Plaintiff will refer to the allegedly applicable arbitration agreement at issue in Experian's motion as the "ECS Arbitration Agreement," however, Plaintiff asserts the modifier "allegedly applicable" in each instance.

Dist. LEXIS 71848, at \*29-30 (D. Ariz. June 22, 2010) (cleaned up). "Under the procedural rubric, courts examine factors influencing the bargaining process: 'the real and voluntary meeting of the minds of the contracting party: age, education, intelligence, business acumen and experience, relative bargaining power … [and] whether there were alternative sources of supply of the goods in question.'" *Sw. Pet Prods. v. Koch Indus.*, 107 F. Supp. 2d 1108, 1113 (D. Ariz. 2000) (quoting *Maxwell*, 184 Ariz. at 89-90).

"Substantive unconscionability looks at 'the actual terms of the contract and examines the relative fairness of the obligations assumed.'" *Jones*, 2010 U.S. Dist. LEXIS 71848, at \*29-30 (quoting *Maxwell*, 184 Ariz. at 89). "Substantive unconscionability occurs when there are 'contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.'" *Jones*, 2010 U.S. Dist. LEXIS 71848, at \*29-30 (quoting *Maxwell*, 184 Ariz. at 89).

## III.   ARGUMENT

### A. The ECS Arbitration Agreement is Substantively Unconscionable Because it is Substantially One-Sided Such That Enforcement Would Lead to Oppressive and Unfair Surprise

The ECS Arbitration Agreement is substantively unconscionable under Arizona law. Due to frankly shocking overbreadth, the ECS Arbitration Agreement, as written, would require Plaintiff to arbitrate any conceivable claim he might have against an incalculable number of entities completely unknown to him at the time of the "agreement" between Plaintiff and a complete non-party to this action. Enforcement of the ECS Arbitration Agreement would lead to absurd results, constituting oppression and unfair surprise.

Accordingly, the Court should hold that the ECS Arbitration Agreement is substantively unconscionable and therefore unenforceable.

In Arizona, substantive unconscionability is present "when the terms of the contract are so one-sided as to be overly oppressive or unduly harsh to one of the parties." *Clark v. Renaissance West, LLC*, 307 P.3d 77, 79 (Ariz. Ct. App. 2013). Arizona law directs courts to evaluate "the fairness of the terms of the contract itself" when determining substantive unconscionability. *Id.* One primary and "[r]elevant factor[] [is] whether the contract terms are so one-sided as to oppress or unfairly surprise an innocent party…" *Dueñas v. Life Care Ctrs. of Am., Inc.*, 336 P.3d 763, 769 (Ariz. Ct. App. 2014).

In the case at hand, in or around February 2023, Plaintiff allegedly entered into an agreement with non-party CreditWorks, a credit **monitoring** service provided by Experian Consumer Services ("ECS"). To gain access to CreditWorks, Plaintiff was required to agree to a Terms of Use ("TOU") agreement. [Dkt. No. 27-1, at 2] ("Williams Decl."). The TOU is a single-spaced, approximately forty-five (45) page long document, and includes the ECS Arbitration Agreement among its many provisions. By agreeing to the TOU, Experian contends that Plaintiff agreed to arbitrate every conceivable claim he may have at any point – whether sounding in tort, contract, fraud, or otherwise – against **any** affiliate of ECS, regardless of whether Plaintiff is aware of the affiliation, how remote the affiliation may be, or any other factor. While not defined by the TOU, "affiliate" is understood to mean "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Affiliate, Black's Law Dictionary 59 (7th ed. 1999).

- 4 -

Experian contends that it is an affiliate of ECS by virtue of the fact that both Experian and ECS have the same ultimate parent company, Experian plc. Williams Decl., at 2. Experian plc is a multinational conglomerate boasting an ownership interest in dozens of entities in the United States, South America, Europe, and Africa. These entities operate across several different industries, including healthcare, technology, banking, and finance. If Experian's view is correct, **any** company ultimately owned by Experian plc can compel Plaintiff to arbitration for **any** claim he may have at any point in the future. To demonstrate the perverse results which follow from this shocking overbreadth, a hypothetical is instructive. If Plaintiff were vacationing in Brazil and was hit by a car, only to learn that the vehicle which struck him happened to be owned by MOVA Sociedade de Empréstimo entre Pessoas S.A. ("MOVA") – an Experian-owned company located in Brazil[2] – MOVA could compel Plaintiff's personal injury suit to arbitration using the ECS Arbitration Agreement. Surely, this outcome is one of "oppress[ion]" and "unfair surprise," and not one that any consumer could **ever** reasonably foresee when agreeing to receive credit monitoring services. *Dueñas*, 336 P.3d at 769.

Beyond the absurdity of being forced into arbitration for unrelated claims with ECS' many affiliates, there are somehow even more problematic elements found in the ECS Arbitration Agreement. Specifically, the definitions incorporated into ECS Arbitration Agreement are broad enough that the number of parties who could potentially compel arbitration thereunder numbers in the **millions** – if not more. The full list of parties Experian

---

[2] https://www.experianplc.com/media/latest-news/2022/experian-agrees-to-acquire-majority-stake-in-mova/

contends can enforce the ECS Arbitration Agreement is as follows: "our respective parent entities, subsidiaries, affiliates (including, without limitation, our service providers), agents, **employees**, predecessors in interest, successors and assigns, websites of the foregoing, as well as **all authorized or unauthorized users or beneficiaries of Services and/or Websites or information** under this or prior Agreements between us relating to Services and/or Websites." Williams Decl., at 16 (emphasis added). An additional hypothetical is again instructive to show the absurd results which follow from the overbreadth of the ECS Arbitration Agreement. Suppose Plaintiff has a neighbor who happens to be employed by ECS. Now suppose Plaintiff and his neighbor have a dispute over where each party's property line ends. Again, Plaintiff's neighbor could compel this real property dispute to arbitration using the ECS Arbitration Agreement.

Furthermore, under the terms of the ECS Arbitration Agreement, apparently even **users** – meaning other customers – can enforce the ECS Arbitration Agreement, whether those users are "authorized or unauthorized." *Id*. Embracing Experian's view means Plaintiff is subject to arbitration under the ECS Arbitration Agreement with respect to **any** claim he has at any time against users of the "Services" and/or "Websites." *Id*. The term "Websites" is broadly defined to include "any affiliated website (including, but not limited to, Experian.com, FreeCreditReport.com, FreeCreditScore.com, CreditReport.com, Creditchecktotal.com, CreditScore.com, usa.experian.com, and experian.experiandirect.com)..." *Id*., at 10. Therefore, under Experian's view, a literal reading of the ECS Arbitration Agreement allows for enforcement by any customer of Experian – a nationwide credit bureau with tens of millions of customers. This scenario is

nothing if not "oppress[ive]" and "unfair" and an absolutely unreasonable result. *Dueñas*, 336 P.3d at 769; *See also Custom Roofing Co. v. Transamerica Ins. Co.*, 120 Ariz. 196, 198 (Ariz. Ct. App. 1978) ("An interpretation of a contract which renders it unreasonable should be avoided.") (citing *Employer's Liability Assurance Corp. v. Lunt*, 82 Ariz. 320, 313 P.2d 393 (1957); *Graver Tank Manufacturing Co. v. Fluor Corp.*, 4 Ariz. App. 476, 421 P.2d 909 (1967)).

Surely, no consumer in existence would reasonably believe that by signing up for credit monitoring services, the consumer was agreeing to go to arbitration for a personal injury lawsuit in Brazil or for a real property dispute with the consumer's neighbor. Experian no doubt understands this, and rather than address the appalling overbreadth of the ECS Arbitration Agreement, Experian will likely argue: 1) Plaintiff's hypotheticals are absurd and thus should be ignored in favor of only looking at the facts of this case; and, 2) the absurdities resulting from Plaintiff's hypotheticals are easily resolved because the disputes are clearly not within the scope of the ECS Arbitration Agreement, and therefore not subject to arbitration.

With respect to the position that the "absurd" hypotheticals should not be considered when evaluating an arbitration agreement, the Ninth Circuit recently rejected this argument in *Revitch v. DIRECTV, LLC* (977 F.3d 713 (9th Cir. 2020)) when evaluating a Fourth Circuit opinion on a similar issue:

> …the majority [of the relevant Fourth Circuit panel] contends that in evaluating the soundness of [the defendant's] preferred interpretation of the arbitration clause, it would be inappropriate for a court to consider the "troubling hypothetical scenarios" to which such an interpretation could give rise. […] [O]ur consideration of hypotheticals […] very much does inform

the question now before the court. […] [W]e employ hypotheticals to discern whether the mutual intent of the parties could have been to form an agreement to arbitrate any and all disputes that might ever arise between [the plaintiff] and yet-unknown affiliates such as [the defendant], no matter how unrelated to [the third party cousin-company's] provision of cellular phone service, including but not limited to the [federal consumer statutory] claim presented here.

*Id.,* at 720. The hypotheticals proposed by Plaintiff here are therefore informative and appropriate for consideration when analyzing the underlying question: Could Plaintiff have possibly foreseen the staggering breadth of Experian's interpretation of the ECS Arbitration Agreement at the time he signed up for CreditWorks?

With respect to any questions of scope, Experian will no doubt point to the "arising out of or relating to" language from the ECS Arbitration Agreement, and dismissively explain that personal injury and/or real property lawsuits clearly are not contemplated by the ECS Arbitration Agreement. This is precisely the problem, and a clear case of Experian wanting to have its cake and eat it too. As explained clearly in Experian's motion, "if there is any dispute as to the arbitrability of Plaintiff's claims, an arbitrator is to resolve such issues." [Dkt. No. 27, at 4]. Plaintiff would no doubt argue in a personal injury suit – as Plaintiff intends to do here if compelled to arbitration – that his claim is not arbitrable under the ECS Arbitration Agreement. However, accepting Experian's position means that MOVA could successfully argue that an arbitrator would need to make a determination on whether Plaintiff's personal injury claim was arbitrable. Plaintiff would then be forced to wait months for an arbitrator to be assigned, petition for a threshold hearing on the question of arbitrability, and – if granted – could only proceed in court several months later.

These hypotheticals serve to highlight the fact that the ECS Arbitration Agreement is undoubtedly substantively unconscionable on its face, and therefore unenforceable. *See Cooper v. QC Financial Services, Inc.*, 503 F. Supp. 2d 1266, 1278 (D. Ariz. 2007) ("The Arizona Supreme Court has held that 'a claim of unconscionability can be established with a showing of substantive unconscionability **alone**…'") (quoting *Maxwell*, 907 P.2d at 59).

However, Experian's attempt to enforce the ECS Arbitration Agreement in this utterly unrelated case is itself a prime example of why the ECS Arbitration Agreement is "oppressi[ve] and [an] unfair surprise." *Dueñas*, 336 P.3d at 769. Plaintiff sought CreditWorks for the purposes of monitoring his credit report. He was not seeking consumer reporting services, nor could he seek such services from CreditWorks, as ECS does not offer any such services. The harms befallen Plaintiff leading to the immediate litigation are wholly unrelated to the credit monitoring services Plaintiff received from CreditWorks. Experian's motion is a transparent attempt to piggyback on Plaintiff's agreement with a separate entity which – purely by happenstance – is owned by the same ultimate parent company as Experian. The expectation that Plaintiff should arbitrate with Experian because of this happenstance is indeed an unfair surprise. *Id*. In short, the ECS Arbitration Agreement is of the kind that Professor Horton has gravely warned of:

> "Infinite arbitration clauses exhibit one or more of the following characteristics. First, they are 'not limited to disputes arising from or related to the transaction or contract at issue.' For instance, Wells Fargo's customers agree to arbitrate '[a]ny unresolved disagreement,' and Steiner's arbitration clause covers 'all disputes, claims or controversies whatsoever.' Thus, infinite provisions attempt to govern conduct that has nothing to do with the original transaction, such as sexual harassment after the purchase of household goods or 'a punch in the nose during a dispute over medical billing.' Second, infinite clauses extend beyond the original contractual partners. Like Mobility's Customer Agreement--which applies to the

parties' 'subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users'--infinite clauses govern all persons or entities with a connection to the container contract. Third, infinite provisions have no sunset date. Although the common law condemns perpetual contracts, infinite clauses 'survive the closing of [an] account or termination of any service.' […] **They are less a contractual provision and more a kind of arbitration servitude.**"

David Horton, ***Infinite Arbitration Clauses***, 168 U. Pa. L. Rev. 633, 652 (2020).

This "infinite arbitration clauses" moniker and Professor Horton's 2020 publication by the same name were recently discussed in some detail by the Ninth Circuit. *See Revitch*, 977 F.3d 713. In affirming the lower court's denial of the motion to compel arbitration, the Ninth Circuit noted the limitless breadth of the arbitration "agreement" at issue would lead to "absurd results" including [the plaintiff being] forced to arbitrate any dispute with any corporate entity that happens to be acquired by [defendant's parent company], even if neither the entity nor the dispute has anything to do with providing [the contractual] services to [plaintiff]…". *Id.*, at 717.

The notion that Plaintiff's agreement to receive credit monitoring services – including agreement to the ECS Arbitration Agreement – included an agreement to arbitrate with millions of parties, the identities of whom are unknowable to Plaintiff, is just such an "absurd result[]". *Id.* The overbreadth of the ECS Arbitration Agreement further makes this provision "oppress[ive]" and "unfair" in its one-sidedness. *Dueñas*, 336 P.3d at 769. The only party to this case which could have conceivably known the identity of all who could apparently enforce the ECS Arbitration Agreement at the time of the "agreement" was Experian. Plaintiff had no way of knowing which – or how many – parties are considered "affiliates," "employees," or "authorized users" of the "Services" and/or "Websites"

- 10 -

defined in the ECS Arbitration Agreement. It is difficult to imagine a more "one-sided" contractual provision than a provision which only one-side can conceivably or reasonably understand. Accordingly, the Court should intercede and hold that the ECS Arbitration Agreement is substantively unconscionable and therefore unenforceable.

### B.  The Totality of the Circumstances Surrounding Plaintiff's Agreement to the ECS Arbitration Agreement Were Procedurally Unconscionable

In Arizona, "Procedural or process unconscionability is concerned with 'unfair surprise,' fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should." *Maxwell*, 184 Ariz. at 88–89 (quoting 2 Dan B. Dobbs, Law of Remedies § 10.7, at 706 (2d ed. 1993)). "Additionally, the ability of a party to alter the printed terms of a contract is a relevant factor in determining procedural unconscionability." *Nickerson v. Green Valley Recreat.*, 265 P.3d 1108, 1118 (Ariz. Ct. App. 2011).

Based on the totality of the circumstances, the ECS Arbitration Agreement is procedurally unconscionable. ECS is allegedly an affiliate of Experian under the shared umbrella of a massive conglomerate with over 20,000 employees and annual revenues of over $5 billion. Plaintiff was required to agree to the TOU, despite the fact that he was never required to view and/or read the TOU before making such an agreement. Williams Decl., at 3 (emphasis added) ("The phrase "Terms of Use Agreement" in the disclosure was off-set in blue text and, **if clicked**, would have presented the consumer with the full text of the agreement."). Moreover, there was no alternative to the ECS Arbitration Agreement, and Plaintiff had no ability to bargain with ECS (or with Experian, whom he had no possible

way of knowing would attempt to force arbitration in a wholly unrelated lawsuit arising under federal law). To that end, the TOU specifically states: "**IF YOU DO NOT AGREE WITH ANY OF THESE TERMS OR CONDITIONS, DO NOT USE, ACCESS OR ORDER ANY SERVICE OR ACCESS OR USE THE WEBSITES.**" Williams Decl., at 11. In other words, if Plaintiff wished use the CreditWorks service, he had one option and one option only: agree to the cumbersome TOU, including the "infinite" ECS Arbitration Agreement. In order to understand the full extent of why these circumstances present such a problem for consumers, a broader view of the credit landscape is required.

In 2023, a consumer's credit score and credit history are more important than ever. Poor credit scores or derogatory marks in a consumer's credit history can cause a consumer to be denied a mortgage, an automobile loan, a rental application, an employment position, or even enrollment in a higher education institution. In short, the difference between a good and bad credit history can mean a dramatically better – or worse – life for a consumer. Consequently, it stands to reason that the vast majority of consumers know that they have a substantial interest in staying informed about their credit.

Consumers can retrieve their credit reports from Experian and the other two major credit bureaus – Experian's co-defendants Equifax Information Services, LLC ("Equifax") and Trans Union, LLC ("Trans Union") – for free from AnnualCreditReport.com ("ACR") once per year. However, the credit reports provided by ACR do not include a credit score, and furthermore leave the consumer unaware of the contents of their credit reports for the other 364 days each year. Therefore, most consumers seek out other free methods to stay up-to-date concerning their credit. One such avenue is the popular app CreditKarma,

through which consumers can check their credit score and full credit report daily. However, CreditKarma provides credit scores and credit reports for **only** Equifax and Trans Union. Experian's conspicuous absence from CreditKarma is, of course, deliberate. Instead, Experian pushes consumers toward its own "free" product – including through the use of aggressive marketing, complete with John Cena advertisements and a prominent national campaign – in order to accomplish dual goals. First, Experian is able to gather data on consumers, then turn around and sell that data for a profit. Second, Experian ensures that the consumer unknowingly bargained away their right to litigate and has forever bound themselves to arbitrate any conceivable claim they may have against Experian. It is unsurprising that there is no free service in existence through which a consumer can regularly check their Experian credit report without being forced to arbitrate all possible claims against Experian. For this reason, it becomes painfully clear that for consumers who want to be proactive concerning their credit – including their Experian credit report – the "option" of simply not using the CreditWorks website is at best a Hobson's choice.

Moreover, the TOU states it can be unilaterally modified at any time. Williams Decl., at 13 ("AMENDMENTS"). Therefore, it is feasible that even if Plaintiff read each and every term of the TOU, he could be bound tomorrow to completely different terms. Given the sophistication of Experian as contrasted with Plaintiff – along with Experian's ability to modify the ECS Arbitration Agreement at any time, and unilaterally – it is evident that there was no "bargaining" as is required for a conscionable contract in Arizona. *Maxwell*, 184 Ariz. at 89; *see also Nickerson*, 265 P.3d at 1118.

Furthermore, "infinite" arbitration clauses like the one found in the ECS Arbitration Agreement are contrary to public policy, and deeply harmful to American jurisprudence. It is no secret that the lengthy contracts consumers regularly agree to in exchange for services like CreditWorks are often ignored by the consumer entirely, or otherwise go unread. However, "they trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated." *Nationstar Mortg., LLC v. West*, 237 W. Va. 84, 89, 785 S.E.2d 634, 639 (2016).

This issue was recently discussed by the Fourth Circuit in *Mey v. DIRECTV, LLC* (971 F.3d 284 (4th Cir. 2020)). Therein, Judge Harris – in his dissent later relied upon by the lower court on remand to find unconscionability and setting forth the basic holdings of the late Ninth Circuit decision in *Revitch*, discussed above – eloquently stated "[n]o reasonable person procuring cell-phone service from AT&T Mobility and reading the attendant arbitration clause would understand 'affiliate' to include any and all future corporate cousins, as yet unidentifiable, and regardless of whether their relationship with AT&T Mobility would have anything to do with the provision of services under her cell-phone contract." *Mey*, 971 F.3d at 303 (Harris, J., dissenting).

It is worth noting that the arbitration clause in *Mey* – ultimately held to be unconscionably overbroad on remand – was **less overbroad** than the ECS Arbitration Agreement. The arbitration clause at issue in *Mey* did not include customers as parties who could enforce the arbitration clause, while the ECS Arbitration Agreement contains language allowing for exactly that. Surely, public policy cannot favor arbitration agreements that can be enforced by millions of unknown parties and for claims that have

no relation whatsoever to the services under which the original arbitration agreement is entered. Agreements as overbroad as the ECS Arbitration Agreement are harmful and serve as nothing more than a deterrent for consumers to seek justice.

The totality of the circumstances surrounding Plaintiff's agreement to arbitrate matters with ECS were procedurally unconscionable. Plaintiff had no ability to bargain with ECS, and ECS represents the only free method through which Plaintiff can monitor his Experian credit score and credit report. ECS built in a contractual "right" to unilaterally amend the "agreement" at will, and the ECS Arbitration Agreement itself is an "infinite arbitration clause." Moreover, due to its shocking overbreadth, the ECS runs directly contrary to public policy interests. For these reasons, the Court should hold that the ECS Arbitration Agreement is procedurally unconscionable and therefore unenforceable.

### C. The Delegation Clause is Unconscionable Because It Is Unreasonably Overbroad

Plaintiff briefly discusses the delegation clause contained in the ECS Arbitration Agreement. In circumstances where a party seeks to avoid an arbitration clause containing a delegation clause, the party must challenge both the overall arbitration agreement and the delegation provision. *See Oliver v. First Century Bank, N.A*, No. 3:17-CV-00620-MMA-KSC, 2018 WL 1426877, at *3 (S.D. Cal. Mar. 22, 2018) ("[T]the party seeking to avoid arbitration bears the burden of raising specific arbitrability challenges, including a challenge to the enforceability of a delegation clause.") (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72-74 (2010)). Here, the delegation clause found in the ECS Arbitration Agreement is unconscionable for the same reasons outlined above with respect to the ECS Arbitration

Agreement as a whole. Specifically, the class of parties who can allegedly enforce the delegation clause are potentially innumerable, and their identities could not and cannot be known to any party to this suit other than Experian. Accordingly, the delegation clause should similarly be found to be both substantively and procedurally unconscionable, and therefore unenforceable.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Experian's Motion, and any other judgment the Court deems just and proper.

Date: May 16, 2023,                    Respectfully submitted,

*/s/ James Ristvedt*
CONSUMER ATTORNEYS PLC
James Ristvedt, AZ Bar #035938
8245 N. 85th Way
Scottsdale, AZ 85258
E: jristvedt@consumerattorneys.com
T: (480) 626-1956

CONSUMER ATTORNEYS PLC
David A. Chami
AZ No. 027585
E: dchami@consumerattorneys.com
8245 N. 85th Way
Scottsdale, Arizona 85258
Telephone: (480) 626-2359

*Attorneys for Plaintiff*
*Esteban Arciniega*

1

## **CERTIFICATE OF SERVICE**

2

3

I hereby certify that on May 16, 2023, I electronically filed the foregoing document

4

with the Clerk of the Court using the ECF system. Notice of such filing will be sent to all

5

attorneys of record in this matter.

6

*/s/ Nataly Clark*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28